**C & F PACKING COMPANY, INC., Plaintiff,**

v.

**DOSKOCIL COMPANIES, INC., Defendant.**

**No. 88 C 4031.**

United States District Court, N.D. Illinois, E.D.

May 2, 1989.

---

Raymond P. Niro, William L. Niro, Joseph N. Hosteny, John C. Janka, Niro, Scavone, Haller, Niro & Rockey, Chicago, Ill., for plaintiff.

Robert H. Morse, Mark T. Priesing, Galland, Kharasch, Morse & Garfinkle, P.C., Washington, D.C., Edward L. Foote, Julie A. Bauer, Winston & Strawn, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This case began as an apparently simple intellectual property dispute over the design of a method for manufacturing precooked sausage toppings for pizzas. Out of such humble beginnings has mushroomed an all-out war peppered with serious allegations of attorney misconduct. Not even the Court has remained secure, as it now finds itself caught in the crossfire of the allegations of impropriety.

The take-no-prisoners approach which the parties have applied to this lawsuit represents a deviation from the normal litigation practices over which this Court usually presides. The Court cannot believe that either party will ultimately benefit from the money, time and emotion expended in this case. Indeed, the Court has on a number of occasions expressed this philosophy to both parties. The fight has become an end in itself, benefitting no one other than the attorneys, the only ones who gain from prolonging and enlarging every dispute.

This memorandum opinion is necessitated by defendant's motion for sanctions in connection with discovery disputes. Defendant's motion, as is often the case with sanctions motions, has been countered by plaintiff's own requests for sanctions. In order to address the issues raised by the parties, a detailed exposition of the underlying facts and the history of the case is required.[1]

### II. BACKGROUND

C & F Packing Company, Inc. ("C & F") filed its complaint on May 6, 1988. According to the complaint, C & F had developed

---

1. A substantial portion of the relevant facts are disputed by the parties, who have submitted numerous affidavits, documents, and transcripts in support of their contentions. Where the Court has had to resolve a disputed fact, the nature of the dispute is set forth.

a unique extruded sausage product for use as a pizza topping and a unique process for manufacturing that product. C & F introduced its product through Pizza Hut, a national pizza restaurant chain. Because of Pizza Hut's large demand for the sausages, Pizza Hut asked C & F to establish alternative sources for the product. One of the alternative sources which C & F established was defendant Doskocil Companies, Inc. ("Doskocil"). C & F allowed Doskocil access to C & F's technology and entered into a confidential disclosure agreement with Doskocil. However, according to the complaint, Doskocil did not adopt C & F's process and did not become a supplier for Pizza Hut. Rather, C & F alleges, Doskocil used the confidential information in an unauthorized fashion to compete directly with C & F. Count I of C & F's complaint alleges unfair competition through misappropriation and use of confidential information; Count II alleges breach of confidence; Count III alleges unjust enrichment; and Count IV alleges breach of contract. Federal jurisdiction is based on diversity of citizenship.

Doskocil filed an answer on July 8, 1988, and alleged as a counterclaim that C & F tortiously interfered with Doskocil's business relations with Pizza Hut. It was not long before the parties' attorneys decided to start playing "hardball" and litigate this case to the hilt. The parties quickly became embroiled in discovery disputes. At a status hearing on July 21, 1988, the Court set a discovery cut-off date of November 21, 1988. The following day, the parties' attorneys agreed among themselves that their discovery disputes should be heard by the Court on August 19. On July 22, Doskocil filed a motion for protective order, which it noticed for hearing on August 19. Doskocil's motion sought to postpone any compliance with C & F's discovery requests until after C & F provided a more detailed description of the confidential information allegedly misappropriated by Doskocil.

On July 25, C & F filed a motion to compel discovery, which it noticed for hearing on July 28, 1988. C & F sought to compel depositions, production of documents, and an inspection of Doskocil's premises. C & F also sought recovery of attorneys' fees incurred in connection with its motion. C & F argued that Doskocil's conduct in noticing its motion for August 19 was part of a course of conduct intended to delay and stall discovery, but, as Doskocil later pointed out, C & F failed to inform the Court of the parties' agreement that the discovery disputes should be heard together on August 19. On July 28, the Court denied Doskocil's motion for a protective order and granted C & F's motion to compel, subject to the parties' agreement on a protective order which would ensure confidentiality. The Court, resolving one dispute over the terms of such a protective order, ruled in favor of C & F that the protective order should not require, as a condition for discovery, that C & F furnish a detailed, technical description of its extruded sausage manufacturing process.

During subsequent negotiations over the terms of the protective order, Doskocil represented to C & F that its manufacturing process embodied trade secrets, and it expressed a desire that access to such trade secrets not be extended to any officers or employees of C & F. Doskocil accordingly insisted that the protective order limit such access to C & F's outside counsel and third party experts. C & F stated that it would agree to such a restriction only if Doskocil would enter into a stipulation that Doskocil's manufacturing process involved trade secrets. As C & F's counsel stated in a letter to Doskocil's counsel, "We can debate later whether or not they are C & F's trade secrets or Doskocil's trade secrets." (C & F's Motion to Compel Discovery, Ex. C, filed Aug. 24, 1988.) Doskocil refused to enter into such a stipulation, and C & F again moved to compel discovery and requested sanctions.

The Court, concerned about C & F's attempt to try one of the ultimate issues in the case through the "back door," denied C & F's motion on August 29. The Court noted that the protective order on which the parties had tentatively agreed specifically applied only to information which was identified as confidential. The Court assumed that Doskocil's counsel, in accord-

ance with their obligations as attorneys, would not identify non-confidential information as confidential. The Court saw no reason to require a separate certification that this information encompassed trade secrets.

On September 27, Doskocil filed suit in federal court in Wichita, Kansas, seeking a declaratory judgment that Doskocil had not infringed on C & F's patent and that C & F's patent was invalid. On November 4, C & F moved to transfer the patent case from Kansas to Chicago pursuant to 28 U.S.C. § 1404(a). On November 9, Doskocil moved to transfer this case from Chicago to Kansas, also pursuant to 28 U.S.C. § 1404(a). This Court denied Doskocil's transfer motion on November 15.

On November 8, Doskocil took a turn at moving to compel discovery. Doskocil maintained that C & F's response to Doskocil's document requests dated July 22 and October 4 were incomplete and that Doskocil had therefore been required to postpone an inspection of C & F's plant and to postpone depositions of C & F's witnesses scheduled for November 10 and 11. C & F responded that, although it had made broad written objections, it had nonetheless assembled a number of documents for Doskocil's review which Doskocil had refused to inspect. C & F contended that Doskocil was trying to stall and manipulate discovery so that depositions would occur while C & F's lead counsel was out of the country. The Court determined that Doskocil had not adequately complied with Local Rule 12(k), which requires counsel to meet in a good-faith effort to resolve discovery disputes. On October 15, the Court entered and continued Doskocil's motion pending a meaningful 12(k) conference and Doskocil's review of the documents C & F had already assembled. On October 21, Doskocil withdrew its motion to compel, and the Court set a new discovery cut-off date of February 21, 1989.

On January 13, 1989, Judge Sam Crow of the U.S. District Court for the District of Kansas ordered the patent case transferred to Chicago pursuant to 28 U.S.C. § 1404(a). Upon its transfer, the patent case was assigned to Judge James Holderman. On January 31, C & F submitted a motion to this Court requesting that the patent case be consolidated with this case. C & F noticed its motion for hearing on February 2, in violation of this Court's requirement that all motions be served and submitted at least three business days in advance of hearing.[2] On February 1, Doskocil moved for a postponement of the February 2 hearing and accused C & F of deliberately scheduling the hearing for a date when C & F knew Doskocil's counsel was unavailable. The Court entered and continued the motion, and the parties submitted further briefs.

On February 3, C & F filed yet another discovery motion, which it noticed for hearing on February 8. This motion sought a protective order barring the depositions of five lower-level C & F employees whose depositions Doskocil sought to take in Chicago on February 15.

On February 6, while its motion for protective order was pending, C & F also submitted an emergency motion to compel Doskocil to make certain Doskocil employees available for depositions. One of the disputed depositions was that of David Smoak, Senior Vice President and Chief Financial Officer of Doskocil, whose deposition was originally noticed on September 7, 1988 for September 23, 1988. The other depositions were those of Doskocil's Director of Research and Development, Mary McMurry; Doskocil employee John Haugsness; and Doskocil itself pursuant to Fed. R.Civ.P. 30(b)(6). C & F had noticed these three depositions on January 3, 1989, scheduling them for February 7 to 9. Cognizant of the approaching discovery cut-off date, Doskocil subsequently scheduled depositions of Pizza Hut for February 7 to 9—the same dates.

In response to C & F's emergency motion to compel depositions, Doskocil argued that

---

**2.** This Court hears motions only on three days' notice unless special permission is obtained from the Court. *See* "Procedures To Be Followed In Cases Assigned To Judge Ilana D. Rovner," available from the Court.

McMurry and Haugsness were non-party witnesses who had not been properly subpoenaed. In any event, Doskocil stated that it was willing to produce McMurry and Haugsness at their place of employment, in Hutchinson, Kansas, on February 8, 9 and 10, but objected to C & F's insistence that the depositions take place in Wichita, Kansas. Doskocil also stated that, despite its original objection that Smoak had no first-hand knowledge of any facts relevant to the lawsuit, it had already agreed to make Mr. Smoak available during the week of February 6. Doskocil objected, however, to C & F's recent request that the Smoak deposition occur in Wichita rather than in Hutchinson, the site designated in C & F's notice of deposition. Doskocil also requested that the Rule 30(b)(6) deposition be postponed from February 8 to February 10 on the ground that the most appropriate individual, Irwin Unruh, had recently passed away. Finally, Doskocil objected to any postponement of the Pizza Hut depositions.

The Court's hearing on C & F's emergency motion to compel depositions took place on February 6, 1989, only a few hours after it was filed. The Court began by once again postponing the discovery cut-off date, this time until March 15, a move which the parties indicated would relieve many of their problems. The Court then ordered that the four Doskocil depositions (Smoak, Haugsness, McMurry, and the Rule 30(b)(6) deposition) take place in Hutchinson on February 8, 9 and 10 in any order that the parties could agree upon. Finally, the Court suggested that, as long as counsel were going to be in Kansas for the Doskocil depositions, they should do the Pizza Hut depositions at the same time if possible. In its minute order reflecting these rulings, the Court denied Doskocil's motion for sanctions but affirmed that fees and costs would be awarded on future discovery motions.

At 4:30 p.m. on February 7, at the request of Doskocil's counsel, David Monroe,[3] the Court held another hearing, this time by telephone on the record with counsel for both parties. Monroe stated that he was running into scheduling problems because he had not yet begun the deposition of Pizza Hut employee Mr. Killian. Doskocil's counsel could not complete Killian's deposition that evening, but they could not continue it on February 8 without affecting the court-ordered Doskocil depositions. Furthermore, Killian planned to leave the country a few days later and to be unavailable until mid-March, at which time insufficient opportunity would remain to perform follow-up discovery before the discovery cut-off date. The Court resolved this problem by setting a yet another new discovery cut-off date of April 21, 1989.

On February 8, the Court ruled with respect to C & F's motion for a protective order that the depositions of the five lower-level C & F employees would take place on C & F's premises and would be limited to one hour. The Court entered and continued C & F's motion to consolidate. The Court also set a briefing schedule on C & F's newly filed motion to permit a further inspection of Doskocil's plant.

Sometime during the week of February 6, C & F's counsel informed Doskocil's counsel that they intended to take the deposition of former Doskocil employee Gary LaClair on February 11. The exact circumstances of this notice are disputed. *See infra* at 674–78. After several attempts, Doskocil attorney Robert Morse was first able to contact LaClair at 5:00 p.m. on Thursday, February 9. According to Morse, LaClair stated that he had not received a subpoena. Morse then informed LaClair that in connection with this lawsuit, it was Doskocil's policy to offer the services of its attorneys to represent ex-employees at any depositions taken by C & F. LaClair stated that he would consider this offer. (Morse Aff. no. 1 at ¶ 5.)[4]

---

**3.** Also representing Doskocil are Robert Morse, Mark Priesing and Julie Bauer. C & F is represented by Raymond Niro and William Niro.

**4.** "Morse Aff. no. 1" refers to the affidavit of Morse submitted with Doskocil's motion to ter-

minate the Smoak deposition. "Morse Aff. no. 2" refers to the affidavit of Morse submitted with Doskocil's reply brief in support of this motion.

The following day, Friday, February 10, the deposition of Smoak began at 9:30 a.m.[5] Attending on behalf of C & F were Raymond and William Niro, and C & F vice-president Gerald Freda. Representing Doskocil were Robert Morse and Mark Priesing. At approximately noon, Morse suggested, off the record, that a lunch recess be taken. Raymond Niro responded that he was adjourning the Smoak deposition for the day and that he was going to begin the deposition of LaClair at 1:30 that afternoon. Morse then asked the court reporter to go back on the record, and the following exchange took place:

> MR. MORSE: In off the record conversations Mr. Niro has informed me that he wants to adjourn this witness at 12:15 to take the deposition of a third party witness that he says has been subpoenaed, and for which I have received no notice, and nobody in my firm has received a notice. Nobody in Chicago at our local counsel has received a notice.
>
> MR. NIRO: Well, I have fax records that show that that's not so, but you can allege that you didn't receive notice.
>
> MR. MORSE: We're talking about Mr. LaClair?
>
> MR. NIRO: Yes. In fact, he's the gentleman that you talked to last night that you said you didn't receive any notice from. And, as I understand it, offered to represent him free of charge. But in any event we can deal with that later. You not only have notice in terms of the actual deposition notice that we served on you, but the witness has been served with a subpoena. You have talked with the witness last evening. You have offered to represent the witness last evening and the deposition was set for Saturday as an accommodation to you, because I understand that you have indicated to my brother, Bill, that you cannot be available on Saturday. We have asked the witness whether he would agree to testify earlier. He has agreed to do so. We have his deposition now scheduled to begin at 1:30 today, and I

> invite you to be there. I hope that you attend. If you choose not to, that's your prerogative.
>
> MR. MORSE: Let me tell you our position, Mr. Niro. You've noticed Mr. Smoak's deposition. He came back early in order to attend, pursuant to your request. When I said that he could only give us the morning, you asked if he could give us all day and I made that request to Mr. Smoak and he has agreed to be here until four o'clock today for his deposition, and I'm prepared. My flight is scheduled such that I'm here until four o'clock today for Mr. Smoak's deposition. That's what I intend to do. With regard to Mr. LaClair—
>
> MR. NIRO: Well, we'll have to adjourn his deposition—
>
> MR. MORSE: With regard to Mr. LaClair, the first time we found out from anyone that you intended to take his deposition was yesterday, verbally, from Mr. Bill Niro, who informed me that Mr. LaClair had received a subpoena, and I told him that I was unaware of it. This was all on the record of the McCurry deposition. I informed Mr. Niro at that time that that was inadequate notice. Subsequently, I talked to Mr. LaClair last night who informed me, and this is the conversation we had, that he had not yet received a subpoena. I told him that Mr. Niro had insisted that Mr. LaClair had already been served with a subpoena, and if Mr. LaClair and you interpret that as my calling either you or Mr. Bill Niro a liar, that's unfortunate, but the facts are what they are. Mr. Bill Niro did insist a subpoena was served, and I found out from Mr. LaClair last night that he had received no subpoena. With regard to representation, Mr. LaClair—
>
> MR. BILL NIRO: Well, let me just tell you that Mr. LaClair received a subpoena. And you're inaccurate in your representation of what I said to you.
>
> MR. MORSE: The short of the matter is this; we'll continue this deposition until

---

5. The parties dispute whether the Smoak deposition had been planned for a half day or a full day. The Court concludes that Doskocil's counsel had agreed to make Smoak available for a full day. *See infra* at 673–74.

four o'clock today, and we will schedule a deposition of Mr. LaClair on proper notice. With regard to the representation of Mr. LaClair, he is a 14 year or 17 year past employee of Doskocil having left just a week or so ago. When I spoke to Mr. LaClair I told him it was the company's policy in this litigation to offer representation to any past employees, as we did to Mr. Wendel Strong.

MR. NIRO: Sounds like solicitation of business to me.

MR. MORSE: It doesn't to me, particularly when there's no charge. But the fact of the matter is Mr. LaClair—

MR. NIRO: Let's finish with this deposition and see how far we can go before we adjourn it. As I said—

MR. MORSE: We're prepared to go till four o'clock today. If you adjourn this witness prior to that time you're going to have to go back to court before you get this witness again. As far as Mr. La-Clair goes, we do not have adequate notice, and if you proceed to take his deposition it is at your peril. We will not be there.

MR. NIRO: We're taking Mr. LaClair's deposition this afternoon because you indicated that you would not be available tomorrow. David Monroe said at the deposition of Ms. McCurry that Mr. Smoak would be available only for half a day today—

MR. MORSE: That is not true.

MR. NIRO: We will not be able to conclude his deposition, even if it went till seven o'clock tonight.

MR. MORSE: It doesn't matter. We brought the man back and he's prepared to stay until four o'clock today.

MR. NIRO: Since you will not be available tomorrow—are you going to be available tomorrow?

MR. MORSE: I won't be available tomorrow.

MR. NIRO: You won't be available tomorrow, as I understand it, and would not agree to stay over till tomorrow to have Mr. LaClair's deposition taken.—

MR. MORSE: That's inadequate notice.

MR. NIRO: Mr. LaClair is available. You have talked with him last evening. You have been on notice of his deposition both locally and through your office, which was served by facsimile and we have a record of the time of the transmission—

MR. MORSE: What's your record of the transmission?

MR. NIRO: I don't have it with me. I have a record of it.[6]

MR. MORSE: Was it day before yesterday?

MR. NIRO: In fact, not only do we know that you received it, as I understand it, during the course of the depositions, your partner or associate, was in contact with your office on the subject, that very subject of the deposition so—

MR. MORSE: The way that came up is that Mr. Bill Niro mentioned that he was intending to take the deposition, we called back to see whether we got our notice, and we found out we had not. Now, is this on Wednesday we're talking about, this so called notice? That notice is inadequate. You know it and I know it.

MR. NIRO: All right. We're going to proceed. You can do what you think is appropriate. We'll see you at 1:30, if you're not there we're going to proceed. We're trying to accommodate your desire to be present at the deposition of Mr. LaClair. We could proceed tomorrow and, as I understand it, you've refused to be present tomorrow. We're giving you an opportunity to be present this afternoon, if you choose not to be present, that's your decision to make.

MR. MORSE: If you prematurely end the deposition of this witness after dragging him back from Oklahoma City, you're going to explain why you did that to Judge Rovner.

MR. NIRO: I'm going to explain that— I'd be happy to explain it to you right now. The explanation is very simple, that you will not be available on Saturday when we have Mr. LaClair's deposi-

---

**6.** This statement ultimately proved to be inaccurate. *See infra* at 675–77.

tion notice, and as a consequence of that, and as an accomodation to you, given the fact that we can't finish Mr. Smoak's deposition, just as you've been unable to finish Mr. Freda's deposition on two separate occasions, now going on the third, we[']re unable to finish his deposition by the four o'clock deadline that you've set, and we are going to proceed with Mr. LaClair because he's an important third party witness, whose testimony, we think, is important to the resolution of the issues here and we're trying to do that in a manner that will accommodate you. I don't think it's appropriate for you not to be there but it's your decision, it's your client. If you choose not to be present at the deposition you do so at your own risk. I'm not telling you to attend, I'm asking you and advising you that we're going to proceed on that basis and if you choose not to attend that's your prerogative. Mr. Priesing is here and if you would allow him to come over, as a further compromise, I would offer to allow this deposition to continue if you think it's appropriate, there are two lawyers on each side there. You can have Mr. Priesing come down to the deposition of Mr. LaClair and my brother can proceed with this deposition while I proceed with Mr. LaClair, and that way we can accomodate your desire to continue with this deposition [and] at the same time do the other deposition. Any of those options are fine with me.

MR. MORSE: I don't care what you do with Mr. LaClair. All I care about is that the deposition here go forward. I think the deposition of Mr. LaClair is not proper notice. We will not attend, but I do intend to stay here at this deposition until four o'clock today.

MR. NIRO: That's your decision to make.

(Smoak Dep. at 93–100.)

At that point, the deposition of Smoak continued, but it was not long before the dispute flared up again:

MR. NIRO: I have approximately five to six hours of additional testimony, as you can tell from the stack of papers.

MR. MORSE: No, I cannot.

MR. NIRO: Well, I have that much.

MR. MORSE: I don't believe it.

MR. NIRO: Well, you may not believe it, but I'm telling you I'm on page three of ten pages of notes so—

MR. MORSE: We're prepared to go until four o'clock today.

MR. NIRO: I understand you are.

MR. MORSE: As you requested.

MR. NIRO: Consistent with what I told you and the way in which other depositions have been handled throughout this proceeding, including the deposition for the Pizza Hut personnel and the Freda's [sic], I think it's best that we give you the opportunity to at least be present at this third party deposition. If you choose to not do that, why you can sit here for whatever benefit you think that provides.

MR. MORSE: We're trying to find out whether Judge Rovner's available to take a conference call from us to discuss a continuation of this deposition or your leaving this deposition to take Mr. LaClair. My position quite frankly—well I'll tell Judge Rovner my position.

MR. NIRO: Well, I hope you don't have an ex parte conference, but I'll be proceeding with that deposition that afternoon.

MR. MORSE: We're going to get her on the phone right now. So if you walk out of here I'll tell the judge you were invited to attend and chose to walk out of here.

MR. NIRO: You can tell Judge Rovner whatever you like. I would just simply caution you not to make statements to the court ex parte that are incorrect. I am going forward with the deposition this afternoon. If you choose not to be there, then, that's fine.

MR. MORSE: Are you saying that you will not walk into the next room to talk to Judge Rovner on the phone?

MR. NIRO: No, I'm not saying that at all. What I'm saying is—

MR. MORSE: Let's go in and do that, then, and find out what Judge Rovner says about it.

MR. NIRO: What I have to do is get ready for a deposition that starts at 1:30.

MR. MORSE: Well, I'm glad you said that because I'm entitled to cross-examine this witness. I'm entitled, therefore, to go through a tremendous volume of documents looking for Mr. LaClair's name, which was only mentioned to me two days ago. That is not enough notice for me to do that. I think it's unfortunate that you want to proceed by this procedure but let's see what Judge Rovner has to say about it.

MR. NIRO: That's fine.

(Smoak Dep. at 104–06.)

During this conversation between Robert Morse and Raymond Niro, Mark Priesing called the Court to request an emergency hearing. He explained to the Court's law clerk that counsel were discussing an attempt by C & F to terminate the Smoak deposition and to take the deposition of LaClair that afternoon without prior notice. After consulting with the Court, who was engaged in a pretrial conference on another case, the law clerk told Priesing that the Court would hear the parties at 1:30 p.m. that day. Although C & F's representatives knew that Priesing was contacting the Court, they left the premises before Priesing and the law clerk concluded their conversation. (Morse Aff. no. 2 at ¶ 10.)

While they awaited the 1:30 court hearing, Doskocil's counsel tried unsuccessfully to reach LaClair. They also interviewed a number of Doskocil employees to determine who LaClair was. They discovered that he had been employed by Doskocil for fifteen to sixteen years, that he had left the company on unfriendly terms within the past two weeks, and that he was represented by counsel in connection with his termination. (Morse Aff. no. 1 at ¶ 12.)

At 1:30 p.m., Priesing and Morse called the Court. They initially spoke to the law clerk, who asked whether both parties were present. Doskocil's counsel explained that C & F's attorneys had left the premises and had refused to participate in the hearing. The law clerk relayed this information to the Court, who arranged for a court reporter to be present to record the hearing.

The hearing then began as follows:

MR. MORSE: This is Bob Morse. I apologize to have to bother you.

THE COURT: Let me just get this down. It is 88 C 4031 C & F versus Doskocil. Let me explain that this is on the record. I have my court reporter taking this down.

MR. MORSE: Good. I feel more comfortable because the Niro brothers have chosen not to attend.

(Transcript at 2.) Morse then proceeded to explain the circumstances, including the arrangements for Smoak's deposition, C & F's termination of that deposition, C & F's insistence on proceeding with the LaClair deposition, and C & F's refusal to participate in the court hearing. The following then transpired:

MR. MORSE: ... We don't know where the deposition is, your Honor, since we don't have the notice. We weren't told by them where the deposition is of Mr. LaClair. We think it is probably one of two places, although possibly a third. It could either be at the Holiday Inn where the Niros stayed last night or it could be at Mr. LaClair's home. And we tried calling his home and his wife said he is due home at about 1:00 or 1:30. Or it could be at some lawyer's house that we have not been informed of, lawyer's office, rather that we have not been informed of. We simply don't know.

THE COURT: You don't have to run through the streets of Hutchinson, Kansas looking for this—looking for this deposition.

MR. MORSE: I appreciate that, your Honor. To be fair, Mr. Niro said he sent us a notice. He refused to tell us where he sent it, although he intimated it was probably within a day or two of today, when we told him we honestly didn't get this notice so tell us about this deposition. So we don't know where it is.

I am sorry that neither Bill nor Ray could stay here to have this conversation with the Court because we think that it is important that we not be following a

procedure of noticing depositions on such short notice so that the other party can't have a reasonable period of time to prepare. Our point is also that Mr. Smoak, having been tremendously inconvenienced and his company tremendously inconvenienced by his being called back from Oklahoma City to attend this deposition, is now sitting here with the rest of the afternoon free that he planned to be at a deposition. And we believe that that is totally unfair to the company and to Mr. Smoak. He is not a fact witness....

THE COURT: Well, let me just say this. Of course, I am going to ask you for an affidavit—

MR. MORSE: I will be more than—

THE COURT: —as to all of this. I am going to ask you to bring a motion.

MR. MORSE: I will do so.

THE COURT: I think I have heard enough, unless there is something more that you want to add.

MR. MORSE: No, I will bring a motion. I will ask for costs, and I will ask for an order that the deposition be noticed on reasonable notice for the future, and that the LaClair deposition insofar as they have taken any deposition transcripts be a nullity, and they notice it on some proper basis.

THE COURT: And I may add to that, unless there is some awfully good explanation for all of this, that C & F's deposition of Smoak may be—of Mr. Smoak may be all over.

MR. MORSE: Thank you, your Honor.

THE COURT: This is terribly distressing. All right. If there is anything else that you want to add, I certainly will listen. Otherwise, I am certain I will see you—well, now, here is a problem. I will—I am leaving town—I am going to be out of town Thursday. You can notice it up for Wednesday though. I will give you, you know, special permission to do that.[7]

MR. MORSE: Thank you, your Honor.

THE COURT: You know, normally I insist on the three days. But I would like to get this over with while it is still fresh in everyone's mind.

MR. MORSE: And so would we.

THE COURT: All right. But be sure and notice it by Monday.

MR. MORSE: Yes.

MR. MORSE: We will do it by Monday for Wednesday.

THE COURT: Okay.

MR. MORSE: I think we have to give them actual in hand notice by 4:00 o'clock on Monday.

THE COURT: That's right.

MR. MORSE: We will do that.

THE COURT: Well, good luck. What else I can say I don't know.

MR. MORSE: I just feel terrible that I have to bother a federal district judge with something like this and I really do apologize.

THE COURT: I will tell you that I don't know what else you could have done under the circumstances. So there is nothing to apologize about today, if indeed this is—you know, normally—hopefully, there are two sides to every story.

MR. MORSE: I am sure Mr. Niro will have his side. And I don't want to mischaracterize anything; that is why I am trying to be very careful. That is why I wanted Mr. Smoak here and my other colleagues so that we could have everyone who was in the room at the time make sure I didn't say something to you that is a misstatement.

THE COURT: Well, I didn't hear any of them jump on you or muzzle you.

MR. PRIESING: No.

THE COURT: All right. Take care.

MR. MORSE: Thank you, your Honor.

THE COURT: Bye.

MR. MORSE: Bye.

(Transcript at 5–8.)

On Monday, February 13, Doskocil brought its motion for discovery sanctions. The Court, already familiar with the circumstances and knowing that a briefing schedule would be necessary, instructed its staff to call both parties and tell them that they need not appear on the motion and to

---

7. *See supra* at n. 2.

inform them that C & F's response brief would be due February 23 and Doskocil's reply brief would be due March 2. C & F filed its response with the Clerk of Court's office on February 22. On February 23, both parties attended a previously scheduled pretrial conference with the Court. The pre-trial conference proceeded for approximately two hours before it came to the attention of the Court (who had not yet received C & F's brief from the Clerk's office) that C & F, in its response brief, had requested the Court's recusal. The Court then terminated the conference and suspended all other work on the case pending resolution of this motion. Before departing from the pretrial conference, C & F withdrew its motion for consolidation of the patent case with this case.

## III. DISCOVERY SANCTIONS

### A. *The Smoak Deposition*

■ The first sanction sought by Doskocil is an order that the deposition of David Smoak be terminated. Doskocil argues that most of the questions asked of Smoak during the two and one-half hours that his deposition proceeded were of marginal relevance at best, centering on such subjects as Doskocil's debt structure (represented by C & F to be relevant to prejudgment interest) and a trade publication advertisement of which Smoak had no direct knowledge. C & F responds that Smoak's testimony is crucial because he is responsible for the management of this litigation and is competent to testify about such areas as sales volumes, profits, prior trade secret litigation, secrecy policies, and discussions with technical employees who visited C & F.

Doskocil also emphasizes that Smoak is a busy man who inconvenienced both himself and Doskocil by changing his schedule to be available on the day of his deposition. C & F argues that Doskocil never agreed to make Smoak available for the whole day, but rather insisted that his deposition be limited to the morning. The Court finds to the contrary. There is no dispute that Doskocil initially requested that the deposition be limited to the morning. Counsel for both parties, however, submit opposing affidavits concerning whether Doskocil subsequently agreed to make Smoak available for a full day. Doskocil's counsel, Robert Morse, asserts that he communicated this agreement to C & F's counsel, Raymond Niro, on February 6 by telephone. (Morse Aff. no. 2 at ¶ 2.) Smoak states that he then made arrangements to be available for a full day on February 10. (Smoak Aff. at ¶ 3.) C & F counters that when Raymond Niro arrived in Hutchinson to take Smoak's deposition, he "understood" that Smoak would not be available on the afternoon of February 10. (R. Niro Aff. at ¶ 5.) His co-counsel, William Niro, contends that after the February 8 deposition of Mary McMurry (an officer of Doskocil), Morse informed him that Smoak "had no knowledge of the facts relevant to the case and that, therefore, he expected his deposition to end after the morning session at about 12:00." (W. Niro Aff. at ¶ 7.) C & F also submits the affidavit of its vice-president Gerald Freda, who states that he was present at discussions between opposing counsel and that based on those discussions it was always his understanding that Smoak would be available only for a half day. (Freda Aff. at ¶ 6.)

The Court credits Doskocil's evidence and discounts C & F's evidence for several reasons. First, the specific assertions in C & F's affidavits are not inconsistent with Doskocil's agreement to make Smoak available for a full day. The theme in C & F's affidavits is that Doskocil expected C & F to finish after the morning session—not that Doskocil refused to permit the deposition to continue beyond that. This conclusion is also consistent with William Niro's reference to the morning "session" of a deposition. (W. Niro Aff. at ¶ 7.)

Second, C & F initially noticed LaClair's deposition for the day following the Smoak deposition, notwithstanding that the deposition would then be taken on a Saturday. If C & F's counsel had believed that the Smoak deposition would not continue into the afternoon, it would presumably have been more likely for C & F to notice the deposition of LaClair (who was unemployed) for that afternoon.

Third, before the Smoak deposition was adjourned, Morse stated: "When I said that [Smoak] could only give us the morning, you asked if he could give us all day and I made that request to Mr. Smoak and he has agreed to be here until four o'clock today for his deposition, and I'm prepared." (Smoak Dep. at 95.) Although this statement was made during one of the many times when the parties' attorneys argued about everything they could, C & F's counsel never took issue with Morse's statement or expressed any surprise.

Based on these factors, the Court concludes that Morse did indeed inform C & F's counsel that Smoak would be available for a full day. Although it is likely that he continued to emphasize that Smoak had little relevant information and that he "expected" that the deposition would not last beyond the morning, the Court finds that he did not insist that the deposition be limited to the morning.

More importantly, however, the Court finds that C & F has waived any right to continue Smoak's deposition at a later date. This Court had ordered the Smoak deposition to proceed when it did. C & F chose to flout this order by unilaterally adjourning the deposition in favor of a separate deposition which was not the subject of a court order, which was not an emergency (*see infra* at 678–80), which had been mentioned only within the past few days, and which had been rescheduled for that afternoon without advance notice. Indeed, even if the LaClair deposition were proper, C & F could have proceeded with the Smoak deposition as well, using one attorney at

each deposition. However, C & F conditioned proceeding with the Smoak deposition on Doskocil's willingness to attend the LaClair deposition.[8] A court-ordered deposition is not something on which a party may place conditions. C & F was given every opportunity to proceed with the Smoak deposition, and it chose to forego continuation of that deposition. C & F had its chance, and it is now in no position to maintain that after unilaterally terminating the deposition it has a right to continue the deposition at a later date. C & F has knowingly and deliberately waived the continuation of the deposition. Doskocil, having made Smoak available pursuant to the Court's order and being spurned, has no obligation to make him available again.[9]

### B. *The LaClair Deposition*

■ The second sanction sought by Doskocil is an order pursuant to Fed.R.Civ.P. 26(c) and 32(a) that C & F be precluded from using the LaClair deposition taken on February 10. Doskocil argues that the notice it received was not reasonable and violated Fed.R.Civ.P. 30(b)(1), which provides:

A party desiring to take the deposition of any person upon oral examination shall give *reasonable notice in writing* to every other party to the action. The notice shall state the *time* and *place* for taking the deposition and the name and address of each person to be examined. . . .

(Emphases added.)

#### 1. C & F's account

The parties give differing accounts of how notice was given. According to C & F,

---

**8.** C & F argues that it was Doskocil's counsel, not C & F's counsel, who was unwilling to compromise. Fortunately, the exchange took place on the record. *See supra* at 669–70. In light of the Court's finding, *infra*, that the LaClair deposition was improper, Doskocil's counsel was justified in refusing to attend the LaClair deposition. On the other hand, in light of the Court's order that the Smoak deposition proceed, and in light of Smoak's rearrangement of his schedule to be available that day, C & F's refusal to proceed with the Smoak deposition was unreasonable—and it would have been unreasonable even if the LaClair deposition had been proper. Furthermore, it is apparent that C

& F's obstinacy was not caused by a necessity to have both of its attorneys present at the LaClair deposition, for the LaClair deposition transcript contains no indication that William Niro attended.

**9.** As noted above, Doskocil sought the same relief for the alternative reason that Smoak was deposed primarily about matters which are not material to this lawsuit. Doskocil invokes the Court's power to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense. *See* Fed.R.Civ.P. 26(c). The Court does not reach this alternative ground for terminating the Smoak deposition.

Raymond Niro served a notice of deposition on Doskocil's counsel in both Washington and Chicago on February 7, 1988, the day after he learned of LaClair. This notice scheduled the deposition for Saturday, February 11. (Mem. in Opposition at 4.) The following day, during the deposition of McMurry, Doskocil's counsel Robert Morse entered the room at about 4:00 p.m. and immediately announced, "I do not work on Saturdays." After exchanging greetings, William Niro began discussing with Morse the fact that C & F had scheduled the deposition of LaClair for February 11. Morse stated that he had received no subpoena for this deposition. Niro asserted that providing him with a subpoena for this deposition was not necessary and informed Morse that he had sent him and his local counsel a notice of deposition. Morse stated that he had not received any notice and that he would not participate in the Saturday deposition. (W. Niro Aff. at ¶ 6.)

The deposition then resumed, and it was adjourned at 4:30 p.m. After McMurry's departure, the attorneys again discussed the LaClair deposition. Morse stated his expectation that the Smoak deposition would end at about noon. Niro replied that he would then attempt to reschedule LaClair's deposition for February 10 at 1:30 p.m. Morse replied that he did not have notice, so he would not necessarily agree. Niro responded that Morse was now placed on notice and that the deposition would be held on February 10 at 1:30 p.m. at the Holiday Inn in Hutchinson. (W. Niro Aff. at ¶ 7).

On February 9, William Niro deposed John Haugsness and Tony LaChance. At the conclusion of these depositions, he discussed the scheduling of depositions with Morse. Morse stated that David Smoak had little knowledge of the relevant facts and that he therefore expected Friday's Smoak deposition to end around noon. Niro responded that he did not know how long the Smoak deposition would last, but that he would be prepared to adjourn it and to commence the LaClair deposition at 1:30. Morse objected that he had insufficient notice. (W. Niro Aff. at 10.)

On the morning of February 10, Raymond Niro arranged with LaClair to take his deposition at 1:30 that afternoon. Shortly before noon that day, during the Smoak deposition, Niro advised Morse that he planned to adjourn the Smoak deposition and begin the LaClair deposition that afternoon. (R. Niro Aff. at 6) He further advised Morse that the deposition would take place at the Holiday Inn. (R. Niro Aff. at 6; W. Niro Aff. at 13.) The court reporter employed by C & F to record the Smoak deposition also states that Raymond Niro informed Morse of the location of the deposition. (Flores Aff. at 4.)

2. Doskocil's account

Doskocil claims that the first notice it had of the LaClair deposition was the conversation between William Niro and Robert Morse at the conclusion of the McMurry deposition on February 8. Niro told Morse that he planned to depose LaClair on February 11, and Morse objected that he had not received notice. Niro claimed that a notice of deposition had been sent to Doskocil's counsel. Morse called his own office in Washington and his co-counsel's office in Chicago and was informed that no notice had been received. He then reaffirmed to Niro that he had not received adequate notice and that he would need more time to prepare. (Motion to Terminate at 3; Morse Aff. at ¶ 4.) Morse asserts that he did not state "I do not work on Saturdays" upon entering the room in which the McMurry deposition was proceeding, but rather entered the room quietly and took a seat without interrupting the deposition. (Morse Aff., Mar. 1, 1989, at ¶ 5; Monroe Aff. at ¶ 4; McMurry Aff. at ¶ 4.) (C & F has not cited to any portion of the McMurry transcript in support of its contention that Morse made the announcement in issue.)

On the evening of February 9, C & F's and Doskocil's counsel happened to dine at the same restaurant. C & F's counsel approached Doskocil's counsel's table to greet them, but they did not mention any intent to reschedule the LaClair deposition for the afternoon of February 10.

Doskocil's first indication that C & F planned to depose LaClair on the afternoon of February 10 came at about noon on February 10, during the Smoak deposition. The conversation set forth *supra* at 668–70 then took place. Doskocil's counsel insist that they were never told the location of the LaClair deposition.

### 3. Written Notice

The factual disputes concerning the mechanics of the notice center around whether Doskocil's counsel was ever given written notice of the LaClair deposition; whether Doskocil's counsel was ever informed of the location of the deposition; when Doskocil's counsel actually learned of the deposition; and when Doskocil's counsel learned that C & F had rescheduled the deposition for Friday afternoon.

First, the Court concludes that no written notice of the LaClair deposition was given. This conclusion is based both on the affidavits and on correspondence in which the parties engaged subsequent to the LaClair deposition. In support of its contention that written notice was sent, C & F refers the Court to the affidavits of Raymond Niro, William Niro and Gerald Freda. None of these affidavits is persuasive. Raymond Niro states only that "I had my secretary type a notice of deposition and I instructed her to serve it on opposing counsel in Washington and Chicago." (R. Niro Aff. at ¶ 3.) William Niro states that on February 8, when Morse entered the McMurry deposition, "I knew at that time that notice of the scheduled deposition of Gary LaClair had been sent to Mr. Morse." (W. Niro Aff. at ¶ 6.) Niro does not state the source of this knowledge, and the Court therefore does not lend his assertion any weight. The cited portion of Freda's affidavit makes no mention of written notice but rather discusses only the conversation between Morse and William Niro at the conclusion of the McMurry deposition. (Freda Aff. at ¶ 5.) C & F does not submit the evidence of anybody—such as Raymond Niro's secretary—who alleges having personal knowledge that written notice was given.

The evidence presented by Doskocil is more probative. In addition to the affidavits by Doskocil's counsel that they never received or were able to locate any written notice (Morse Aff. no. 2 at ¶¶ 3, 12–14; Monroe Aff. at ¶¶ 6–10; Priesing Aff. at ¶ 11; Bauer Aff. at ¶¶ 2–6), Doskocil relies on correspondence aimed at reconstructing what happened. On February 15, Raymond Niro sent a letter to Morse by facsimile to which he attached a Transmit Confirmation Report indicating that a three-page facsimile transmission had been made on February 7. The letter stated:

Please confirm by tomorrow, if possible, that you received a facsimile copy of our notice of deposition for Gary LaClair which, as you can see from the enclosed copies of our Transmit Confirmation Report, was sent to you, together with a cover sheet on February 7, 1989.

Unless we hear from you to the contrary or you can provide us with some documented proof that you did not receive the notice of deposition, as indicated in our Confirmation Report, we believe your representation to the Court that you did not receive our deposition notice is inaccurate.

(Morse Aff. no. 2, Ex. A.) Doskocil's counsel searched their records and found that the three-page facsimile described in the Transmit Confirmation Report was a copy of C & F's corrected notice of motion to permit inspection. On February 16, Morse informed Raymond Niro by facsimile that he stood by his position that no notice of the LaClair deposition had been received. (Morse Aff. no. 2, Ex. C.)

That same day, Niro sent another facsimile to Morse, requesting copies of the three-page and 21–page facsimile transmittals that were made on February 7. The February 16 facsimile stated in part:

We believe that the deposition notice you contend you did not receive was included in those materials and further that confirmation copies were mailed to you on the evening of the 7th.

All you need do to prove the contrary, at least as to the facsimile transmissions, is to send us today copies of precisely

what it was that you received with the facsimile transmission information on the top of the particular documents.

I might note that the only documents we are aware of that were prepared and sent on the 7th were a corrected notice of motion (two pages), the deposition notice (two pages) and the motion to permit inspection (19 pages).

(Morse Aff. no. 2, Ex. D.) Doskocil's counsel again reviewed their records and determined that the 21–page transmission did not consist of a 19–page motion and a two-page deposition notice, but rather C & F's 21–page motion to permit inspection. (Morse Aff. no. 2 at ¶ 14 and Ex. E.) Still on February 16, Morse sent another facsimile to Niro stating this conclusion and repeating that no written notice of the LaClair deposition had been received. (Morse Aff. no. 2, Ex. F.) This transmission included a copy of the two-page notice of motion and stated that a copy of the 21–page motion was being mailed. In C & F's surreply, C & F did not dispute that the 21–page transmission included only the 21–page motion and did not include a deposition notice. Furthermore, C & F has not submitted any facsimile confirmation report corresponding to the alleged notice of deposition. The Court thus finds that Doskocil has provided the proof, invited by Niro, that the notice of deposition was never transmitted.

This is not to say that C & F never intended to give written notice of the deposition. The Court accepts Raymond Niro's representation that he instructed his secretary to serve notice on Doskocil's counsel. It appears, however, that for some reason notice was never sent. C & F would be well-advised to be much more careful in reviewing their own records before directing accusations of falsehood at opposing counsel. It certainly is not in the best tradition of the profession to reflexively blame one's opponent for every mistake before making sure that a mistake was not one's own.

### 4. Knowledge of Location

The Court also finds it likely that Doskocil's counsel did not actually know of the location of the deposition. The Court finds credible Doskocil's counsel's statements to this effect in their affidavits and their statements to the Court during the February 10 hearing. For instance, if Morse had actually known that the deposition was to take place at the Holiday Inn, it is unlikely that instead of representing simply that he did not know the location, he would have offered his belief that the location could be any of three places, including the Holiday Inn. On the other hand, the Court is skeptical of the affidavits and representations submitted by C & F's counsel. For instance, the court reporter's statement that he heard Raymond Niro inform Morse of the location of the LaClair deposition during the exchange which took place during the Smoak deposition (Flores Aff. at ¶ 4) is suspect in light of the fact that this exchange occurred on the record and yet the transcript makes no mention of the Holiday Inn.[10] The Court does find C & F's evidence credible insofar as C & F's counsel believed they had given oral notice of the location of the deposition. It appears, however, that for some reason relating to the overall confusion, the location was never actually communicated to Doskocil's counsel.

### 5. Time of Actual Notice

In accordance with the Court's conclusion that no written notice of the LaClair deposition was provided, the Court also concludes that Doskocil's counsel first became aware during the late afternoon of February 8 that C & F had scheduled the deposition of LaClair for February 11. With respect to notice that the deposition would proceed on February 10 rather than February 11, C & F contends that notice was given during the February 8 conversation and Doskocil contends that notice was

---

**10.** Doskocil's counsel Mark Priesing raises questions about the impartiality of Flores, based on a February 13 conversation in which Flores informed him that preparation and delivery of an expedited transcript of the Smoak deposition would take longer than would a regular transcript. (Priesing Aff. at ¶ 12.)

not given until noon on February 10. What most likely occurred is that prior to February 10 there was some discussion by C & F's counsel of the possibility of rescheduling the LaClair deposition, that Doskocil's counsel was not receptive to this possibility, and that C & F's counsel did not state that they had actually rescheduled the deposition to February 10 until the noontime conversation on that date. However, even if oral notice were given earlier than noon on February 10, the Court's conclusion as to the reasonableness of this notice would not be affected.

### 6. Reasonableness of Notice

In support of its position that the LaClair deposition notice was reasonable, C & F relies on *Hart v. United States*, 772 F.2d 285, 286 (6th Cir.1985), in which the court held that a trial court may be free, in certain circumstances, to dispense with the requirement of written notice; [11] *Federal Aviation Administration v. Landy*, 705 F.2d 624, 634–35 (2d Cir.1983), *cert. denied*, 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983), in which the court approved four days' notice for an out-of-town deposition; *Warning Lites Co. v. S.H. Leggitt*, 32 F.R.D. 431 (W.D.Tex.1963), in which the court ordered a deposition to be given priority where it had been orally noticed prior to (but noticed in writing subsequent to) receipt of a deposition notice from the other party; and *Radio Corp. of America v. Rauland Corp.*, 21 F.R.D. 113, 115 (N.D. Ill.1957), in which the court approved written notice one day in advance for a deposition in Oslo, Norway, where both counsel were already in Oslo.

None of the cases cited by plaintiff involve the particular circumstances present here, and the most that can be gleaned from the case law is that the reasonableness of notice must be determined under the individual circumstances of each case. *See, e.g., Hart*, 772 F.2d at 286; *Radio Corp.*, 21 F.R.D. at 115. Hair-splitting over the exact number of days of notice

which were given or how many were reasonable is not particularly helpful, although it would be a rare case indeed in which it would be reasonable to schedule a deposition with oral notice of an hour and a half—which is essentially what happened here, since it was not until noon on February 10 that C & F's counsel manifested an absolute intent to proceed with the deposition at 1:30 p.m. that afternoon.

In the circumstances of this case, it can only be concluded that the notice was not reasonable. The relevant circumstances affecting the reasonableness of the notice were that: (1) counsel had been in Hutchinson beginning February 8 and planned to be there until February 10; (2) the Court had ordered the Smoak deposition to proceed that week; (3) C & F's counsel intended to depose LaClair on a weekend; (4) C & F's counsel viewed LaClair's deposition as being urgent; and (5) this case had a history of discovery disputes which necessitated judicial intervention.

■ Under these circumstances, the only reasonable notice would have consisted of both written notice and oral notice accompanied by a good faith effort to schedule the deposition at a mutually convenient time. Written notice was essential because it ensures that the other side has knowledge of the deposition and its time and place and because it prevents precisely the types of disputes which have arisen here. *See Associated Transport, Inc. v. Riss & Co., Inc.*, 8 F.R.D. 99, 100 (N.D.Ohio 1948). Written notice may only be dispensed with in the most unusual circumstances, and such circumstances do not exist in this case. Oral notice was essential as well because C & F's attempted written notice occurred on late afternoon the evening before depositions were scheduled to begin in Hutchinson, creating a substantial possibility that written notice would not come to the attention of opposing counsel even if it were properly sent. Finally, good faith consultation, which is strongly urged in all

---

**11.** This Court does not reach the issue of when, if ever, written notice may be excused. *Cf. Federal Aviation Administration v. Landy*, 705

F.2d 624, 634 (2d Cir.1983) ("the Federal Rules require written notice to opposing counsel").

cases,[12] became a necessity in this case because of the history of discovery problems, the frantic pace of discovery, the short notice given by C & F, and the fact that C & F's counsel wished to proceed on a weekend, after Doskocil's counsel were presumably scheduled to have returned to their offices.

■ The factors relied on by C & F to support the short notice are unavailing. C & F asserts that exigent circumstances necessitated haste because (1) LaClair's testimony was expected to be important and highly relevant; (2) the attorneys were already in Hutchinson; (3) LaClair was a third party witness beyond either party's control; and (4) LaClair was unemployed at the time and stated that he would probably have to relocate outside the Hutchinson area. (R. Niro Aff. at ¶ 4.) The first factor, while it may have been true, does not demonstrate a need for haste. With respect to the second factor, although it is true that the attorneys were already in Hutchinson, it was not unlikely that they would be returning to Hutchinson in the future. C & F therefore could easily have scheduled the LaClair deposition for a future trip rather than schedule it for a Saturday after the conclusion of the trip which was then beginning and was scheduled to end on Friday. The third factor also does not demonstrate a need for haste, particularly since it is apparent from the circumstances and the affidavits that LaClair is not unfriendly with C & F. Finally, although C & F implies that LaClair was preparing to leave town in the near future, there is nothing in the record to support such a conclusion. Although LaClair did expect that the only employment he would find would necessitate his moving out of town, there is no indication that this was likely to happen immediately. Furthermore, there is no indication that C & F's view of the situation as an emergency was ever communicated to Doskocil's counsel, as it would have been if C & F's counsel

had attempted, in good faith, to accommodate the schedules of Doskocil's counsel and reach a suitable compromise.

Indeed, the circumstances evidence considerable bad faith on the part of C & F's counsel, whose actual reason for haste may have been not the four factors cited in Niro's affidavit but a desire to catch Doskocil's counsel off-guard with the deposition of a former employee of Doskocil whose testimony was expected to be hostile to Doskocil. Such an inference could be drawn from the insufficiency of any of the stated motives to fully explain C & F's counsel's haste in scheduling the deposition; their unwillingness to postpone it, despite their willingness to postpone the Smoak deposition; their attempt to condition completion of the court-ordered Smoak deposition on Doskocil's participation in the LaClair deposition; their refusal to participate in the court hearing concerning the propriety of the LaClair deposition; and their insistence on proceeding with the deposition even at the risk of flouting a court order which they knew Doskocil's counsel was attempting to procure. Such conduct by C & F's counsel evidence an arrogance and a contemptuousness that can only be characterized as an all-out attempt to win the case without any regard for professionalism, courtesy or legal niceties.

■ C & F offers two final arguments that the notice should be treated as having been reasonable. First, C & F points out that Doskocil's counsel could have attended the deposition but chose not to do so. C & F appears to equate a physical ability to attend with reasonableness of notice. (See Mem. in Opposition at 25.) This position, however, overlooks the fact that counsel is entitled, when possible, to a date which does not conflict with other obligations and to an opportunity to prepare for the deposition. (Indeed, it may have been precisely a desire to prevent such preparation that created C & F's urgency.) The mere fact that

---

**12.** *See, e.g., Warning Lites, supra,* 32 F.R.D. at 433: "It is an accepted practice ... for attorneys to make an effort to agree among themselves on the arrangements for the taking of depositions before resorting to the giving of formal notice.

This enables them to make arrangements that will suit the convenience of all interested parties. It is a very commendable procedure and one that should be encouraged."

Doskocil's counsel physically was given an opportunity to attend does not make the notice reasonable.

■ Second, C & F maintains that Doskocil's motion is improper because Doskocil never sought a protective order. Under the circumstances, however, a protective order would have been pointless. Because Doskocil's counsel did not know where the deposition was to take place, it was not clear that a protective order could have been communicated to C & F's counsel. Furthermore, even if a protective order had been obtained and served on C & F's counsel, it was not clear that the deposition would have ceased; C & F's counsel had already demonstrated an intent to proceed with the deposition despite their knowledge that a court hearing was being arranged. In any event, Doskocil's counsel, while not explicitly requesting a "protective order," clearly sought and obtained an assurance that they need not "run through the streets of Hutchinson, Kansas" looking for the deposition. However, although it would have been proper for the Court to issue a protective order, the Court gave C & F's counsel the benefit of the doubt. Because it was clear that the deposition was proceeding in any event, the Court insisted on a written motion and reserved judgment until after C & F had an opportunity to respond to Doskocil's allegations.

■ The Court concludes, under all of the circumstances, that Doskocil was not afforded reasonable notice of the LaClair deposition and that C & F's counsel's conduct in scheduling and proceeding with the deposition was improper. The Court therefore grants Doskocil's request that C & F be prohibited from using the deposition at trial, with one exception: Doskocil may use the LaClair deposition at trial (subject, of course, to the Federal Rules of Evidence), and if Doskocil does so, C & F will be permitted to avail itself of Fed.R.Evid. 106. However, the Court denies Doskocil's further request that C & F be barred from using any information contained in the transcript of the deposition in this litigation. Such a proscription would simply be too difficult to enforce; it would necessitate inquiries into whether information was obtained from the deposition or from an independent source. The Court will not set the stage for such impossible inquiries.[13]

### C. Future Depositions

■ In light of the problems discussed above as well as other problems in the scheduling of discovery,[14] Doskocil seeks an order that requires both parties to give reasonable notice of future depositions. Specifically, Doskocil requests that seven business days' notice be required for depositions, in order to allow adequate preparation and travel time and ease last-minute scheduling disputes. The Court agrees that such an order is appropriate under the circumstances of this case, although the order will be for seven calendar days rather than seven business days. Furthermore, although they should be matters of course as to which no order should generally be needed, the Court finds it necessary

---

**13.** Of course, either party may still depose LaClair upon reasonable notice.

**14.** Doskocil asserts, as an example, that C & F recently and on short notice set dates on which it demanded that Doskocil depose certain witnesses, and that C & F stated it would not produce the witnesses unless this unilateral schedule was adhered to. Further, Doskocil claims that C & F's counsel unilaterally rescheduled third party depositions, which Doskocil had scheduled, upon announcing that they were serving as counsel for the deponents. A few days later, Doskocil's counsel received a telephone call from the actual attorney for one of the third-party deponents and was able to reschedule the deposition with that attorney. (Motion to Terminate at 13–14.)

It appears, however, that discovery abuses may not be unique to C & F's counsel. C & F has moved for another protective order, claiming that Doskocil has harassed Pizza Hut through excessive, redundant depositions of Pizza Hut employees. The Court has referred C & F's motion to the magistrate and expresses no view as to the merits of the motion at this time. However, Doskocil's discovery conduct has prompted Pizza Hut's in-house counsel, Steven Emmons, to copy the Court on a letter to Robert Morse in which Emmons complained that further discovery requested by Doskocil was unnecessarily burdensome and was served in a manner that violated the spirit of cooperation which had previously existed.

to add the further requirements that (1) depositions be scheduled for weekdays only; (2) depositions be scheduled only for days on which no other depositions have previously been scheduled; (3) all deposition notices be in writing; and (4) the parties consult in good faith in an effort to schedule each deposition for a mutually agreeable date. The parties may, in specific instances, agree to waive the seven-day notice requirement or requirements (1) or (2).

D. *Monetary Sanctions*

■ Finally, Doskocil seeks monetary sanctions pursuant to the Court's February 6 warning that fees and costs would be awarded in connection with further discovery disputes. First, Doskocil seeks reimbursement for the travel expenses incurred to make Smoak available for his deposition on February 10. The Court denies this request because the Court had ordered the Smoak deposition to proceed at that time, because the occurrence of the deposition itself was proper, and because these expenses would have been incurred whether or not C & F's counsel had engaged in improper conduct. Second, Doskocil seeks reimbursement for Smoak's salary for February 10. The Court denies this request for the same reasons.

■ Third, Doskocil seeks recovery of the costs it expended in preparing, filing and arguing this motion. The Court agrees that such costs should be awarded because of C & F's counsel's conduct on February 10 and the frivolous positions taken in their briefs. This award is granted pursuant to Fed.R.Civ.P. 11, based on the groundless attacks on Doskocil's counsel and the distortions of the record, as described *infra* at 681–90; Fed.R.Civ.P. 37(b)(2) based on the refusal to complete the court-ordered Smoak deposition; 28 U.S.C. § 1927 based on the unreasonable multiplication of proceedings; and the Court's inherent authority to discipline attorneys who willfully abuse the judicial process or act in bad faith, *see Magnus Electronics, Inc. v. Masco Corp.*, 871 F.2d 626, 632–34 (7th Cir.1989) *Fred A. Smith*

*Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir.1988). The costs will include the attorneys' fees and expenses incurred in participating in the February 10 telephonic hearing, and the fees and expenses incurred in briefing and filing Doskocil's motion to terminate, Doskocil's reply brief, and Doskocil's surrebuttal to C & F's surreply. Doskocil is to present its itemization of these fees and expenses in an affidavit, and the Court will make a determination as to the reasonableness of the amount and types of costs sought. No costs are to be recovered for the preparation of the affidavit itself.

## IV. PLAINTIFF'S MOTION FOR CROSS–SANCTIONS

■ C & F has defended Doskocil's motion for sanctions by accusing Doskocil's counsel of misrepresentations and misconduct and by seeking sanctions in return. Doskocil has replied to these charges in a cursory fashion, treating them as too frivolous to be taken very seriously. Considering the grave nature of the claims, the Court has not taken C & F's allegations lightly. However, as discussed below, C & F's accusations are by and large unfounded, and C & F does not appear to recognize the gravity of the charges it makes. *See, e.g., United States v. Mealy*, 851 F.2d 890, 904 (7th Cir.1988) (attorneys "have an ethical obligation to refrain from personal attacks on opposing counsel"). *See also infra* at n. 15. In the eyes of C & F's counsel, accusations of misconduct apparently are merely one more tactical tool to be utilized in the pursuit of victory. The charges ultimately reflect much more on C & F's attitude toward the judicial process than they do on the conduct of Doskocil's counsel.

A. *Misrepresentation*

1. Knowledge of Location of Deposition

First among C & F's many accusations is that Doskocil's counsel lied to the Court when they stated that they were unaware of the location where LaClair's deposition was to be taken. For the reasons described *supra* at 677, the Court concludes

that Doskocil's counsel made no misrepresentations in this regard.

### 2. Suggestions of Simultaneous Depositions

C & F accuses Doskocil's counsel of falsely representing to the Court that Morse suggested simultaneous depositions of Smoak and LaClair and that Raymond Niro refused. C & F claims that it was actually the other way around. It is C & F, however, that is guilty of misrepresentation on this issue. Doskocil did not assert in its motion, as C & F alleges, that Morse suggested simultaneous depositions. Doskocil's assertion was that Morse suggested that "either Raymond Niro or William Niro continue the deposition of Mr. Smoak even if C & F insisted on going forward with the LaClair deposition. Raymond Niro refused." (Motion to Terminate at 6–7.) Morse was unwilling to agree to simultaneous depositions because he did not want to proceed with a deposition for which he had received inadequate notice. Niro, on the other hand, conditioned further progress with the court-ordered Smoak deposition on Doskocil's attendance at the LaClair deposition. *See supra* at 669–70. Thus the concept of "simultaneous depositions," which C & F holds out as a compromise which Doskocil unreasonably rejected, was actually an uncompromising attempt to coerce Doskocil's counsel into participating in an improperly noticed deposition.

### 3. Denial of Accusation of Lying

Next in C & F's list of accusations is the charge that "Mr. Morse denied on the record of the Smoak deposition that he had told a third party witness, Mr. LaClair, that C & F's lawyers had lied to him." (Mem. in Opposition at 5.) The passage referred to is the following statement by Morse:

> I talked to Mr. LaClair last night who informed me, and this is the conversation we had, that he had not yet received a subpoena. I told him that Mr. Niro had insisted that Mr. LaClair had already been served with a subpoena, and if Mr. LaClair and you interpret that as my calling either you or Mr. Bill Niro a liar,

that's unfortunate, but the facts are what they are.

(Smoak Dep. at 96.) Earlier in the deposition, the following exchange had taken place:

> MR. NIRO: ... last night I understand that you talked to a witness, a potential witness in this case and represented that we had lied—
>
> MR. MORSE: Untrue.

(Smoak Dep. at 62.) LaClair now asserts that Morse had "stated that the attorneys for C & F had lied to him concerning the service of a subpoena on me." (LaClair Aff. at ¶ 4.) In light of LaClair's evident partiality, it is not unlikely that Morse merely told LaClair that C & F's counsel had told Morse that LaClair had been served with a subpoena, and that it is LaClair who characterizes Morse's statement as an accusation that C & F's counsel lied. The Court is, however, somewhat incredulous that it is even engaged in an inquiry as to whether an attorney used the word "lie" or "liar." It is undisputed that C & F's counsel had told Morse that they had served a subpoena on LaClair, and it is undisputed that LaClair did not receive the subpoena until after he was contacted by Morse. While Morse's statements concerning whether C & F's counsel were liars may not have exhibited the height of professionalism, the Court finds no basis for concluding that Morse is guilty of misrepresentation on this issue. Indeed, based on the record, Doskocil's counsel could just have easily have accused C & F's counsel of having made misrepresentation, when they stated that LaClair had already been served with a subpoena, but Doskocil's counsel has not followed C & F's counsel's lead into such petty arguments.

### 4. Statements Concerning Smoak's Availability

C & F alleges that Morse was wrong in his statement that he had told C & F's attorneys that Smoak would be available for a full day of deposition testimony on February 10. (Mem. in Opposition at 6, citing Motion to Terminate at 3.) As described *supra* at 673–74, the Court credits

Morse's statement that he did indeed tell C & F's counsel that Smoak would be available for a full day.

### 5. Receipt of Written Deposition Notice

C & F next accuses Morse of lying when he stated that he did not receive written notice of the LaClair deposition. (Mem. in Opposition at 6, citing Motion to Terminate at 3.) It is readily apparent from the correspondence exchanged between the attorneys after C & F filed its Memorandum in Opposition that Doskocil's counsel never received written notice. *See supra* at 676–77. Although C & F's counsel may have honestly believed, when they submitted their Memorandum, that written notice had been delivered, their rash assumption that Doskocil's counsel was guilty of intentional misrepresentations is typical of their approach to many of the issues addressed in this opinion. Such allegations are not cheap ammunition to be fired in shotgun style whenever one finds oneself in a compromising position; they are, rather, very serious matters which necessitate, at the very least, the good faith inquiry mandated by Fed.R.Civ.P. 11.[15] In C & F's counsel's haste to level as many charges as possible against their opponents, such a good faith inquiry clearly was not undertaken. Furthermore, the clear lack of such an inquiry with respect to some of C & F's charges substantially undermines the credibility of the remainder of C & F's arguments.

### 6. Morse's Knowledge of LaClair

C & F asserts that Morse falsely stated that he did not know who LaClair was until the afternoon of February 10. (Mem. in Opposition at 6, citing Motion to Terminate at 7.) Obviously, Morse knew on February 9, when he spoke to LaClair, that LaClair was a former Doskocil employee. What the Motion to Terminate states is not that Morse first found this out on February 10, but simply that on February 10 Doskocil's counsel:

> attempted to interview as many Doskocil employees as could be located ... to find out who Mr. LaClair was. Doskocil counsel discovered that Mr. LaClair had been a 15- to 16-year employee of Doskocil, but that within the last two weeks he had left the company on unfriendly terms. Further, counsel discovered for the first time that Mr. LaClair was represented by counsel in connection with his termination from Doskocil.

(Motion to Terminate at 7.) In support of its position that Morse must have known LaClair's identity before February 10, C & F relies on the affidavits of LaClair and Paul Schmidt, another former employee of Doskocil. Neither the cited paragraphs nor any other paragraphs of LaClair's affidavit contain any discussion whatsoever of the likelihood that Morse knew who LaClair was. Schmidt's affidavit states, "based upon my personal knowledge and experience at Doskocil, Mr. Smoak and those that reported to him had to have known who Mr. LaClair was, what his job responsibilities were and the fact that he had been a 16-year employee of the company." (Schmidt Aff. at ¶ 6.) At most, C & F's evidence supports the position that

---

**15.** As the Seventh Circuit stated in another case involving a recusal motion:

> The substantial question is whether it is unprofessional for a lawyer to make the kind of sworn statement that Mr. Kelly made on the basis of the kind of information that Kelly had when he made it.

> \* \* \* \* \* \*

> The statement in the affidavit was a shot in the dark, a guess. But it was not presented as a guess, or even an inference, it was stated as a positive fact, though Mr. Kelly had made no effort to determine whether it was a fact....

> A statement of positive fact is a representation not only that the fact is true as represented, but also that the person making the statement has a solid basis for making it.

> \* \* \* \* \* \*

> He leaped before he looked.... [L]awyers who make statements to courts under oath concerning the conduct of fellow lawyers and judges and other participants in the administration of justice [must] be scrupulous regarding the accuracy of these statements. A statement that is offered as a positive fact but actually is an extravagant inference from a vague recollection does not satisfy this requirement. It is unprofessional, and thereby censurable under the express terms of Rule 46(c) of the appellate rules, which governs the discipline of attorneys by federal appellate courts.

*In re Kelly,* 808 F.2d 549, 551–52 (7th Cir.1986) (citations omitted).

Morse could have easily discovered relevant information concerning LaClair. Clearly, Doskocil would not argue with this proposition; the quoted passage illustrates that Doskocil's counsel gathered the relevant information in a short period of time. C & F does not, however, argue that Morse was guilty of laziness in not gathering this information before February 10 or that Morse should have been able to prepare for the LaClair deposition before 1:30 on the afternoon of February 10. Rather, C & F accuses Morse of making misrepresentations. The Court finds nothing in the record to support a finding that the quoted passage from the Motion to Terminate is inaccurate.

### 7. Plaintiff's Refusal to Attend Hearing

The final charge of misrepresentation is that Doskocil's counsel erroneously affirmed that C & F's counsel refused to participate in the February 10 court hearing concerning the discovery disputes. (Mem. in Opposition at 6.) A review of the transcript of the Smoak deposition, *see supra* at 670–71, reveals that C & F's counsel clearly did refuse to participate. Despite the knowledge that Doskocil's attorney Mark Priesing was contacting the Court to request a telephone hearing, C & F's counsel deliberately left the premises and proceeded to take the very deposition which they knew was the subject of the hearing. Raymond Niro did express a "hope" that Morse would not engage in an "ex parte conference," but he rejected Morse's invitation to participate in the court hearing. Niro's unilateral decision that a deposition, the validity of which was disputed, took precedence over a court hearing is simply mindboggling. However he wishes to characterize his refusal to participate in the hearing, the fact remains that he did refuse by leaving the premises at the very time a court hearing was being scheduled, and Doskocil's counsel's statement to that effect is not a misrepresentation.

### B. *Other Alleged Misconduct*

#### 1. Calling Counsel Paranoid

C & F raises a number of other instances of alleged misconduct in support of its request for sanctions against Doskocil's counsel. First, C & F complains that Morse called Raymond Niro "paranoid." The passage at issue is the following excerpt from the Smoak deposition:

Q: ... Have you ever considered what the exposure might be if you lose this case, ever?

A: On the advice of counsel I'm not going to answer the question.

Q: You can't answer that question for me today, is that right?

A: On the advice of counsel I'm not going to answer that question.

Q: Did you ever sit down with Mr.—by the way is that what you were told to say after the break?

A: No, I was not given any instructions on the break.

Q: Did you ever sit down and talk with Mr. Doskocil—

MR. MORSE: Mr. Niro, please.

Q: Did you ever sit down a—

MR. MORSE: Because you have paranoia you don't have to take it out on this witness. We had no discussions about this testimony during that break.

MR. NIRO: I'm going to ask you for an apology on this record now. Don't accuse me of any mental illness.

MR. MORSE: You're correct. I apologize.

MR. NIRO: I accept your apology.

MR. MORSE: Forget that I ever accused you of any mental illness. The record will speak for itself.

MR. NIRO: You should control yourself. If you can't control yourself in these proceedings, then I suggest we take a break and you can calm yourself—

(Smoak Dep. at 61–62.) The Court finds this exchange distressing but certainly finds nothing sanctionable. More distressing is the mere fact that C & F has found it necessary to call this exchange to the Court's attention. If, as C & F contends, it is sanctionable for Morse to refer to Niro as paranoid, why is it not equally sanction-

able for Niro to imply that Morse is unable to control himself? While the attorneys again have not conducted themselves as models of professionalism, the quoted statements—obviously made in the context of a relationship which has long been strained—are hardly worth the waste of time which C & F has caused Doskocil and the Court by raising such matters. If C & F's counsel wish to play hardball, they must accept the risk that their own feelings may be hurt once in a while.

### 2. Excessive Objections

C & F's next complaint is that, during the February 8 deposition of Mary McMurry, "Doskocil's counsel initiated 21 conferences, made 41 objections, had over 100 interjections and prompted 40 post-answer changes in testimony." (Mem. in Opposition at 8.) Doskocil responds that the majority of its counsel's interjections were necessary to clarify vaguely worded questions. C & F does not cite any specific instance where it believes Doskocil's counsel's interruptions to have been improper. The number of interruptions made by Doskocil's counsel is in itself no more indicative of bad faith by Doskocil's counsel than it is of improper questions by C & F's counsel. In the absence of specific complaints by C & F, the Court is unable and unwilling to find Doskocil's counsel's behavior improper. In light of the history of this litigation, there is no doubt that any truly improper objections by Doskocil's counsel would have been brought to the Court's attention by motion. In the absence of such serious problems, C & F's vague accusation about the number of interruptions is merely one more piece of padding in a transparent attempt to divert the Court's attention from the issues raised by Doskocil's motion.

### 3. Failure to Produce Witnesses

C & F further claims that Doskocil's counsel have intentionally interfered with discovery by refusing to produce witnesses

on the basis of purported unavailability when those witnesses were actually available, and by coaching witnesses to say "I forgot." (Mem. in Opposition at 8.) Again, these charges are vague and conclusory. The basis for the charge that Doskocil's counsel have lied about the availability of witnesses is that William Niro saw two Doskocil witnesses during breaks from other depositions on Doskocil premises on dates when those witnesses were purportedly unavailable. The mere fact that the witnesses were on Doskocil premises on those dates does not, in itself, mean that the witnesses were not unavailable on those dates, and C & F does not describe the parties' attempts to agree on mutually convenient deposition dates.

The basis for C & F's charge that Doskocil's counsel have coached witnesses is William Niro's statement that "[m]ost of the principal witnesses for Doskocil have uniformly responded to questions by saying, 'I forgot.'" (W. Niro Aff. at ¶ 17.) Of course, the fact that witnesses testified that they have forgotten certain information does not necessarily mean that they have been coached to lie; in the absence of firmer evidence than this, C & F's counsel have no right to make such serious allegations. *See supra* at n. 15.

As with other complaints by C & F, the lack of any motion addressing these purported problems and the lack of elaboration or detail evidence a lack of substance. The Court finds that Doskocil's counsel's conduct is not a ground for sanctions.

### 4. Destruction of Business Relationship

C & F's next charge is that Doskocil has made deliberate efforts to destroy C & F's relationship with Pizza Hut, its biggest customer. (Mem. in Opposition at 8–9.) These efforts, according to C & F, come in the form of difficult, time-consuming and disruptive depositions by Doskocil of Pizza Hut employees. (Freda Aff. at ¶ 10–11.)[16] C & F does not dispute that the testimony of Pizza Hut employees is relevant, al-

---

**16.** Doskocil contends that one reason extensive discovery from Pizza Hut has been necessary is that C & F destroyed its copies of certain communications between it and Pizza Hut. (Monroe Aff. at ¶ 3.)

though subsequent to the briefing of the issues addressed in this opinion C & F did bring a motion to preclude further depositions of Pizza Hut employees on the ground that such depositions were unnecessary and redundant. That motion has been referred to a magistrate. Pizza Hut's own displeasure with the discovery methods employed by Doskocil is apparent from a letter which Pizza Hut's in-house counsel wrote to Morse. *See supra* at n. 14. Whether Doskocil has abused the discovery process is properly considered in connection with that motion rather than as another item in a litany of conclusory accusations of professional misconduct raised as a defense to Doskocil's motion. The Court notes, however, that the letter by Pizza Hut's attorney demonstrates Pizza Hut's ability to distinguish the conduct of Doskocil's counsel from that of C & F, and it is thus less likely that any improper conduct by Doskocil's counsel would damage Pizza Hut's relationship with C & F than that it would damage Pizza Hut's relationship with Doskocil itself—the relationship which Doskocil's counterclaim seeks to protect.

### 5. Morse's Conversation with LaClair

C & F further claims that Morse called LaClair personally even though Doskocil knew that LaClair was already represented by counsel. (Mem. in Opposition at 9.) As support for this charge, C & F cites LaClair's affidavit, in which LaClair affirms:

> Shortly before I left the employ of Doskocil, I retained a local attorney in Wichita to represent my interests. A short time later, I advised Doskocil that I had retained such an attorney to represent me.

(LaClair Aff. at ¶ 2.) C & F has not contended that Morse himself actually knew that LaClair was represented by counsel, nor has C & F contended that Morse should have known this before he called LaClair, nor has C & F disputed Morse's averment that LaClair did not inform him during their February 9 conversation that he was represented by counsel. (Morse Aff. no. 2 at ¶ 8.) Moreover, LaClair's counsel was not retained in relation to this lawsuit, C &

F's counsel apparently had no qualms about dealing with LaClair directly, and there is no indication in the deposition transcript that LaClair was represented by counsel. The Court finds no ground for concluding that Morse's telephone call to LaClair was improper.

### C. *The Telephone Hearing*

#### 1. *Protective Order*

■ The remaining allegations raised by C & F concern the telephone hearing in which Doskocil participated. Initially, C & F complains that the hearing served no legitimate purpose because Doskocil never filed a written motion for a protective order. (Mem. in Opposition at 12.) The Court has already held that the failure to file a written motion for a protective order was not grounds for denying the relief Doskocil requested with respect to the LaClair deposition. *See supra* at 679–80. Further, despite the wonders of modern technology, C & F does not suggest how Doskocil could have prepared and filed a written motion between noon on February 10, when Doskocil learned that C & F intended to go forward with the deposition that afternoon, and 1:30, when the deposition was apparently going to begin. Indeed, C & F can hardly complain about the lack of a written motion when it never informed Doskocil in writing that the deposition would proceed at 1:30 that afternoon.

It is unclear whether Doskocil's presentation of its problem to the Court should be construed as an oral motion for a protective order. Doskocil never used the words "protective order," but it clearly sought assurances that its failure to attend the LaClair deposition would not prejudice its rights. Doskocil could have explicitly requested the entry of a protective order, and the Court perhaps could have granted such a request. However, C & F should be thankful that the Court was more cautious and elected not to enter any orders until Doskocil had submitted a written motion and C & F had had an opportunity to respond. The Court finds that, assuming Doskocil's presentation during the telephone hearing did not constitute a request for a protective order, the failure to make

such a request did not result in a waiver or render the hearing illegitimate.

## 2. Lack of Emergency

C & F next argues that the hearing was improper because Doskocil sought no relief during the telephone hearing that could not have been obtained after the completion of the LaClair deposition. (Mem. in Opposition at 12.) This is true, however, only because C & F's counsel walked away from the hearing. If C & F's counsel had remained on the premises, the Court could have granted immediate relief; it could have ordered that the LaClair deposition be rescheduled. Due to the absence of C & F's counsel, however, any ruling to that effect would have been ineffective. The telephone hearing did take place in an emergency context. C & F cannot unilaterally negate the emergency nature of the hearing by leaving the premises and rendering itself beyond reach of the Court. The fact that, as it ultimately turned out, the Court determined that it could not grant any immediate relief does not retrospectively make the circumstances less of an emergency or render the conference improper.

## 3. Prejudice by the Court

C & F further contends that the hearing was improper because Doskocil succeeded in prejudicing the Court against C & F. (Mem. in Opposition at 13-14, 16-17.) C & F makes this argument only by performing a veritable hatchet job on the hearing transcript, reaching new extremes in the art of taking excerpts out of context.[17] For example, C & F points to the Court's comment that it had "heard enough." (Transcript at 6.) In C & F's eyes, this statement means that the Court had decided

against C & F and had no desire to hear C & F's position. Read in context, the statement clearly means that the Court had no further questions to ask during the hearing, given C & F's absence, and that the Court would still await a written motion and response before making any decisions. (*See supra* at 672.) C & F also focuses on the Court's view that the situation was "terribly distressing." (Transcript at 7.) Clearly, the circumstances were just that: terribly distressing. This was true no matter which party was to be believed. Merely expressing the view that the situation was distressing is hardly an indication that the Court had determined that C & F was at fault.

The ultimate divorce of words from their context, and the ultimate in C & F's departure from common sense, comes with C & F's assertion that the Court's wishing of "good luck" to Doskocil's counsel at the end of the hearing exhibits bias on the part of the Court. (Mem. in Opposition at 13–14, citing Transcript at 8.) Any attorney who has attended motion call before this Court can attest to the Court's habit of wishing "good luck," or of making similar pleasantries, to all those who appear before her. It appears that in the world of C & F's counsel, common courtesy is incompatible with judicial dispute resolution. However, this Court has always endeavored to maintain as much civility as possible in her courtroom; courteous behavior on her part is extended impartially and is hardly indicative of prejudice. The Court is scarcely able to believe that it even need address this issue, but C & F's behavior in latching on to this phrase merely demonstrates the enormous lengths to which C & F must go in its effort to distort the record to divert attention from the merits of Doskocil's motion.[18] Needless to say, C & F chose not to

---

**17.** The practice of distorting the record by selective quotation, of course, is unethical and sanctionable. *See, e.g., Duggan v. Bd. of Educ. of East Chicago Heights*, 818 F.2d 1291, 1297 n. 14 (7th Cir.1987).

**18.** The other excerpts cited by C & F are similarly unsupportive of C & F's allegations of impartiality. The Court's statement that the Smoak deposition "may be all over" (Transcript at 7) was merely an observation of a possible sanc-

tion in the event that Doskocil ultimately prevailed after full briefing. The import of the Court's statement that Doskocil's counsel did not "have to run through the streets of Hutchinson, Kansas looking for this ... deposition" (Transcript at 5) is self-evident; if Doskocil's counsel did not know where the deposition was to be held, the Court was not going to require their attendance. The Court's statement, "I don't know what else you could have done un-

quote the Court's statements that written submissions would be required, that any conclusions were contingent on hearing C & F's explanations, and that "hopefully there are two sides to every story." (Transcript at 6–8.)

C & F further maintains that the prejudice allegedly exhibited during the hearing was confirmed when, upon receipt of Doskocil's written motion, the Court's staff informed both parties that no one need appear on the date for which the motion was noticed and informed them of a briefing schedule. This course of action is routinely taken when the Court is certain that written briefing on a motion will be required. However, in C & F's view, the action appears more sinister: "On order of the Court, C & F was prevented from even appearing in Court when [Doskocil's] motion was noticed to orally tell the Court its side of the story." (Mem. in Opposition at 13.) C & F never requested an oral hearing on Doskocil's motion. The Court hardly, therefore, "prevented" C & F from appearing. It merely wished to save both parties the time and expense of coming to Court when a briefing schedule would be set anyway. If C & F had desired to waive a written response and merely present its position orally, it should have notified the Court of this desire.[19]

der the circumstances" (Transcript at 8) was merely a response to Doskocil's apology for having requested an emergency hearing.

19. It should be noted that the Court rarely hears oral argument on motions after they have been briefed. The only motions on which the Court routinely hears oral argument are minor motions which may be resolved in open Court without burdening the parties with further briefing. See "Procedures To Be Followed In Cases Assigned to Judge Ilana D. Rovner," available from the Court.

20. The cases cited by C & F are inapplicable. For example, C & F cites *United States v. Anderson*, 798 F.2d 919, 924 (7th Cir.1986), for the proposition that judges are bound by Canon III(A)(4). In *Anderson*, unlike this case, the proceedings were not transcribed and there is no indication that the opposing party was given advance notice. Similarly, most of the other cases cited by C & F in its exposition of the dangers of *ex parte* communications did not involve transcribed hearings held with notice to the other side. See *United States v. Earley*, 746

### 4. C & F's Absence from Hearing

Finally, C & F accuses Doskocil and the Court of engaging in an improper *ex parte* hearing in violation of Canon III(A)(4) of the A.B.A. Code of Judicial Conduct, which provides that:

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding....

The hearing, however, was not, strictly speaking, *ex parte;* it occurred with notice to C & F, and it took place on the record. See *D'Acquisto v. Washington*, 640 F.Supp. 594, 621 (N.D.Ill.1986) (*ex parte* hearing is one which denies one party notice and an opportunity to respond); Black's Law Dictionary (5th ed. 1979) ("A judicial proceeding ... is said to be *ex parte* when it is taken or granted at the instance and for the benefit of one party only and without notice to, or contestation by, any person adversely interested."). It was thus no different from innumerable other instances in which one party fails to show up for a motion or status hearing held on the record.[20]

F.2d 412, 416 (8th Cir.1984), *cert. denied*, 472 U.S. 1010, 105 S.Ct. 2707, 86 L.Ed.2d 723 (1985); *Kennedy v. Great Atlantic & Pacific Tea Co.*, 551 F.2d 593 (5th Cir.1977); *Grieco v. Meachum*, 533 F.2d 713, 719 (1st Cir.1976), *cert. denied*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976); *Haller v. Robbins*, 409 F.2d 857, 859–60 (1st Cir.1969); *In re Halser*, 447 S.W.2d 65 (Mo. 1969). The only exception, *McElhanon v. Hing*, 151 Ariz. 403, 728 P.2d 273 (1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987), involved an *ex parte* conversation which was initiated by the judge, who obtained the consent of the other side, and which was expanded beyond its original purpose. The court held that the communication was improper despite the other side's consent. *But see In re Beard*, 811 F.2d 818, 829 (4th Cir.1987) (*ex parte* conversation not improper where all interested parties consent). This case is different from *McElhanon* in that the Court did not seek an *ex parte* conference; the Court would have preferred, and indeed expected, C & F's attendance.

C & F claims that the conduct of both Doskocil's counsel and the Court was improper. With respect to Doskocil's conduct, C & F alleges a violation of Rule 7–110(b) of the Illinois Code of Professional Responsibility, which provides:

In an adversary proceeding, a lawyer shall not communicate or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

(1) in the course of official proceedings in the cause; ...

(3) orally upon adequate notice to opposing counsel....

Ill.Rev.Stat. ch. 110A, Rule 7–110. This rule is on its face inapplicable to the instant case, for C & F did have adequate notice of the hearing. C & F's argument that it lacked adequate notice because its attorneys were notified only of "an indefinite time that might (and in fact did) conflict with scheduled discovery" (Mem. in Opposition at 19) is disingenuous at best. The time was indefinite only because C & F's counsel deliberately left the premises when it knew that the hearing was being arranged—an action which was improper regardless of the merits of the underlying dispute. Further, the only "scheduled" discovery with which the hearing conflicted was the improperly noticed LaClair deposition. If C & F's attorneys had abided by the Court's order that the Smoak deposition proceed, they would not have been absent from the hearing.

The absurdity of C & F's attacks on Doskocil's counsel for initiating the hearing is demonstrated by C & F's reliance on another out-of-context statement in support of its position that Doskocil intentionally excluded C & F from the hearing. The excerpt relied upon by C & F is Morse's statement that he felt "more comfortable because the Niro brothers have chosen not to attend." (Transcript at 2, quoted in Mem. in Opposition at 13.) The full passage is as follows:

THE COURT: Let me just get this down. It is 88 C 4031 C & F versus Doskocil. Let me explain that this is on the record. I have my court reporter taking this down.

MR. MORSE: Good. I feel more comfortable because the Niro brothers have chosen not to attend.

Obviously, Morse's comment stated not a sense of comfort deriving from the Niros' absence, but rather a discomfort which was somewhat alleviated by the presence of the court reporter. The ridiculousness of C & F's characterization of Morse's statement, like many of C & F's other assertions, would be comical in any other context; when employed as a basis for a request for sanctions, it goes beyond frivolity and evinces a blind hostility which has no place in the world of law.

Once again, C & F's allegations of improper conduct are misguided and rely on the most egregious distortions. The Court finds nothing improper in Doskocil's counsel's initiation of the emergency hearing, and C & F's request for sanctions based thereon is denied.

 C & F also contends that the hearing involved judicial misconduct which requires the Court's recusal.[21] 28 U.S.C. § 455 requires a judge to recuse herself from a proceeding in which her "impartiality might reasonably be questioned," or, in other words, "whenever there is a reasonable basis for a finding of an appearance of partiality under the facts and circumstances of the case." *Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985) (citation omitted). *See also United States v. Murphy,* 768 F.2d 1518, 1537 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). The test for deter-

---

**21.** C & F states that it does not accuse the Court of bad faith (Mem. in Opposition at 16) but that it believes recusal to be mandatory (Mem. in Opposition at 1). As with C & F's requests for sanctions against Doskocil's counsel, the recusal request is not contained in a motion but is merely incorporated in C & F's memorandum in response to Doskocil's motion. The Court could deny the request on this basis alone; any request for relief *should be noticed for hearing in accordance with the rules governing motion procedure.* The Court may also be empowered to deny the recusal request on the ground of waiver, because C & F's counsel attended a pretrial conference without informing the Court of their recusal request. However, because of the seriousness of C & F's allegations, the Court has considered them on their merits.

mining whether there is an "appearance of partiality" is "whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case." *Pepsico*, 764 F.2d at 460. Equally important is the principle that a recusal motion "should not be granted lightly; a judge is under as much obligation not to recuse [herself] when facts do not show prejudice as [she] is to recuse [herself] if they do." *United States v. Baskes*, 687 F.2d 165 (7th Cir.1981).

In this case, C & F has not demonstrated an appearance of partiality, *see supra* at 687–88, nor has it demonstrated misconduct, *see supra* at 688. C & F knew of the hearing and chose to ignore it in the hope of gaining a competitive advantage by taking a hastily noticed deposition of a disgruntled former Doskocil employee instead. The Court took every precaution it could to ensure that C & F's rights would be protected. The numerosity or intensity of C & F's accusations against the Court and opposing counsel cannot, in themselves, create an appearance of impropriety or partiality. The Court, therefore, is obligated to remain in this case, and C & F's recusal request is denied.

### D. *Conclusion*

It is often said in sports that the best defense is a good offense. C & F's counsel may believe that hardball litigation is the most effective method for representing their client, but what is true in sports is not always true in our court system. C & F's attorneys find themselves in the position of having to defend the propriety of a deposition which was improperly noticed and which proceeded at the expense of their attendance at a court hearing. Their response contains twenty pages of attacks directed at the integrity of opposing counsel before it addresses, in six pages, the merits of Doskocil's motion. However, it is

C & F's attorneys, not Doskocil's, who are guilty of misrepresentations and misconduct.[22] C & F's counsel's barrage of accusations has succeeded not in diverting attention from their own improprieties, but rather in magnifying them.

### V. CONCLUSION

Doskocil's motion to terminate the Smoak deposition is granted. Doskocil's request for fees and costs incurred in connection with this motion is granted except with respect to Smoak's travel expenses and salary. Doskocil's motion for an order governing reasonable notice of depositions is granted. C & F's requests for sanctions against Doskocil and for recusal of the Court are denied. Doskocil's affidavit in support of fees and costs is due May 16, 1989. C & F's response is due May 30, 1989. Doskocil's reply is due June 13, 1989.

---

**22.** C & F devotes several pages of its brief to an argument that misrepresentations by attorneys mandate sanctions, citing *Lewis v. Lane*, 832 F.2d 1446 (7th Cir.1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988); *In re Disciplinary Action Curl*, 803 F.2d 1004 (9th Cir. 1986); and *In re Phelps*, 637 F.2d 171 (10th Cir.1981). C & F's quote from *Curl* is particu-

larly helpful: "When [the attorney] chose to state as a fact what was at the best a guess and a hope, he engaged in misrepresentation.... The imposition of sanctions is mandatory." 803 F.2d at 1006–07, cited in Mem. in Opposition at 10. It is precisely this kind of behavior which litters C & F's filings.